912 So.2d 101 (2005)
MID-SOUTH ANALYTICAL LABS, INC., Plaintiff-Appellant
v.
JONES, ODOM, SPRUILL & DAVIS, LLP, Defendant-Appellee.
No. 40,089-CA.
Court of Appeal of Louisiana, Second Circuit.
September 23, 2005.
*102 Francis M. Gowen, Jr., Shreveport, for Appellant.
Jones, Odom, Davis & Politz, L.L.P., by Nyle A. Politz, James W. Davis, Shreveport, for Appellee.
Before CARAWAY, DREW and MOORE, JJ.
MOORE, J.
This is an appeal from the grant of a motion for partial summary judgment arising out of a suit for fees for analytical (soil testing) and consulting services. Mid-South Analytical Labs, Inc. (hereinafter *103 "Mid-South" or "plaintiff"), appeals the judgment of the trial court holding that $93,354.33 of its claim for payment for "professional services" fees and all $28,403.50 of its claim for payment for analytical services that it provided to the law firm of Jones, Odom, Spruill and Davis has prescribed. Jones, Odom, Spruill, and Davis (hereinafter "Jones-Odom" or "defendant") answered the appeal alleging that the trial court erred in denying that part of its motion for partial summary judgment that would limit the amount of any Mid-South recovery to $6,645.67 based upon an alleged agreement that Mid-South's consulting fees would not exceed $100,000, and in denying that part of its motion seeking dismissal of Mid-South's claim for attorney fees. For the following reasons, we reverse the judgment of the trial court in part, and remand for further proceedings in accordance herewith.

FACTS
The dispute in this case arose when the Jones-Odom law firm did not pay Mid-South for soil testing and consulting services it provided to Jones-Odom as its expert in the class action case captioned May v. Texaco, Inc. and Bank One.[1] Jones-Odom represented various claimants in the above suit for damages arising from alleged soil contamination caused from Texaco's refinery operations many years earlier on property that is now the Anderson Island subdivision in Shreveport. Mid-South was engaged to take soil samples in the area of concern, perform tests, evaluate the results, and consult with Jones-Odom regarding the case. Jones-Odom contends that most of the testing and professional services were performed between the period from July 19, 1997 and July 24, 1998; however, Mid-South contends there was additional work performed all the way into mid-January of 1999.
There was no written agreement between Mid-South and Jones-Odom, nor is there a record of testimony regarding the terms of the agreement. Mid-South billed Jones-Odom for the first time in April of 1999 when Larry Lott, the president and CEO of Mid-South, sent a letter dated April 23, 1999 to Jones-Odom along with a "Cost Summary for the Anderson Island Project" containing various invoices for all the analytical testing to date, and also a summary bill of the dates and times for consulting or professional services performed beginning July 19, 1997 until January 14, 1999. The invoices, dated April 4, 1999, totaled $28,403.50 for soil testing and $110,246.53 for the professional services. However, in the letter, Mr. Lott alluded to a previous verbal agreement that he would cap the consulting fees to a maximum of $100,000, and that he would honor that agreement, suggesting that Jones-Odom could become current by paying for the analytical testing on a "net 30" basis and $10,000 per month for the consulting (professional) services. Jones-Odom apparently never made any subsequent payment for either category.
On March 19, 2001, approximately 23 months after the bill was sent, Mid-South filed a petition captioned "Petition on Open Account" for the professional and analytical services rendered to Jones-Odom. Jones-Odom responded with a motion for partial summary judgment on grounds that most of the services (soil testing and consultation) had been performed more than three years prior to the filing of the petition, and, therefore all fees incurred prior to March 19, 1998 had prescribed. This amounted to the full $28,403.50 in analytical services and $93,354.33 of the *104 professional services according to Jones-Odom. Additionally, Jones-Odom moved for a partial summary judgment ruling that Mid-South could not recover more than $6,645.67, the difference between the alleged $100,000 cap on professional fees and the $93,354.33 that had prescribed. Finally, it sought a summary judgment ruling that Mid-South was not entitled to any attorney fees because it had not correctly stated the amount due as required by the statute and jurisprudence.
The trial court granted Jones-Odom's motion with respect to the prescribed fees totaling $28,403.50 and $93,354.33 of the professional fees, but it denied the motion limiting any recovery by Mid-South to $6,645.67 and excluding recovery of attorney fees authorized under the open account statute.
Mid-South filed the instant devolutive appeal on the prescription issue, and Jones-Odom has answered the appeal regarding those parts of its motion for partial summary judgment that were denied.

LAW
Summary judgment procedure is designed to secure the just, speedy and inexpensive determination of every action; the procedure is favored and shall be construed to accomplish these ends. La. C.C.P. art. 966(A)(2). Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. NAB Natural Resources, L.L.C. v. Willamette Industries, Inc., 28,555 (La.App. 2 Cir. 8/21/96), 679 So.2d 477.
The initial burden of proof in summary judgment remains with the mover to show that no genuine issue of material fact exists. Johnson v. Sunbelt Builders, Inc., 02-0959 (La.App. 3 Cir. 2/5/03), 838 So.2d 907. Under La. C.C.P. art. 966(C), once the mover has made a prima facie showing that the motion should be granted, the burden shifts to the non-moving party to present evidence demonstrating that material factual issues remain. Id. Despite the legislative mandate that summary judgments are now favored, factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion, and all doubt must be resolved in the opponent's favor. Willis v. Medders, 00-2507 (La.12/8/00), 775 So.2d 1049. The court must draw those inferences from the undisputed facts which are most favorable to the party opposing the motion. Independent Fire Insurance Co. v. Sunbeam Corp., 99-2181, 99-2257 (La.2/29/00), 755 So.2d 226. Summary judgment should be denied if (1) there is a genuine issue of fact and (2) it is material to the case. Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La.7/5/94), 639 So.2d 730.

Open Account or Professional Services
The determinative issue in this case is when prescription commenced running on the amounts due. Mid-South contends that commencement of prescription ultimately turns on whether its agreement or relationship with Jones-Odom was an "open account," or an agreement to provide "professional services," both of which are subject to the three-year prescriptive period. La. C.C. art. 3494.[2] While the *105 remedy provided by the "open account" statute, La. R.S. 9:2781, is available to collect "debts incurred for professional services," plaintiff argues that the distinction between the nature of an open account relationship and a professional services agreement affects the date payment is due, and hence, when prescription commences.[3] In a classic open account arrangement, payment for goods and services is generally exigible or payable upon delivery or performance. Mid-South contends that payment for the professional services it provided did not become exigible until the last professional service was rendered.
Jones-Odom contends, and the trial court agreed, that payment became exigible for each service rendered by Mid-South as it was rendered. Hence, according to this view, each time Mid-South took a soil sample, analyzed it, evaluated the results, or consulted with defendant about them, payment for each separate service became exigible, which is to say, Mid-South could submit an invoice for payment for each service performed. Since the prescriptive period for professional services begins to run from the date payment becomes exigible and continues to accrue as to past due payments even if there is a continuation of labor or services, all demands for payment for any services performed more than three years prior to filing the petition have prescribed.
In point of fact, however, Mid-South did not bill or "invoice" the defendant on a monthly, or on another periodic basis typical of credit accounts, which are analogous to open accounts. Dixie Mach. Welding & Metal Works, Inc. v. Gulf States Marine Technical Bureau, Inc., 96-869 (La.App. 5 Cir. 3/12/97), 692 So.2d 1167. There was no written contract between Mid-South and Jones-Odom, and the record does not indicate any agreement as to the terms of payment. The only evidence in the record of an agreement is the April 23, 1999 letter from Larry Lott to Marshall Jones. In that letter, Lott states that because "there has not been any recent activity on the Anderson Island project, we believe it is necessary to itemize the charges to date in order to update your files." After reaffirming his commitment to cap the consulting fees at $100,000 despite an invoice total of $110,246.53, he proposed that "since we are a service vendor and consultant" the analytical testing should be paid on a "net 30" basis," while the professional services could be paid on a retainer basis of $10,000 per month." Clearly, Lott was trying to set up an "open account" arrangement at this time, at least regarding the testing, perhaps on the advice of his CPA, as he suggests in his letter.
Both parties submitted affidavits. James Davis, a partner in the Jones-Odom law firm and one of the attorneys representing the claimants in the federal case, *106 submitted an affidavit attesting that all of the samples taken, their analyses, and the reports by Mid-South were performed prior to December 31, 1997, and this fact is evidenced by Mid-South's response to a subpoena duces tecum served on Mid-South by an opposing law firm. Davis did not attest to the terms of the agreement between Jones-Odom and Mid-South.
Larry Lott, CEO of Mid-South, submitted an affidavit in opposition contradicting some of the facts attested to by James Davis. In his affidavit, Lott stated that he "entered into an agreement with [Jones-Odom] for ongoing investigative environmental assessment and development of methodology of risk-based total petroleum hydrocarbon speciation" in connection with the lawsuit. Further, he continued to take soil samples well beyond December 31, 1997, and providing evidence of one taken in June of 1998 that was featured in the Shreveport Times. He said also that there was testing of the samples beyond January 1, 1998 "to verify the qualitation [sic] of risk-based TPH[4] methods." He submitted evidence of this by producing a facsimile of an article on the matter that he sent to Marshall Jones regarding this type of testing that Mid-South was performing, and he stated that he had telephone conversations with Jones regarding the testing during that time.
The open account statute was amended in 1983 and broadened to allow professionals that rendered a one-time service to use the streamlined procedure of an action on open account to recover payment. The amendment applies to professional services only. Professionals were always accommodated by the open account statute prior to the amendment; however, the statute failed to address the situation where professional services were rendered in a single transaction. The analogy between professional services and typical open accounts is in the nature of the relationship between the parties and the payment collection process. Professionals, such as lawyers and doctors, frequently render services by billing hours or visits over a period of time. Open accounts are made up of a series of transactions or course of dealings over a period of time. Mine & Smelter, Div. of Kennedy Van Saun Corp. v. Ceres Gulf, Inc., 526 So.2d 404 (La.App. 4 Cir.1988).
In the instant case, Jones-Odom argues that the trial court correctly characterized the action as a suit on open account, as La. R.S. 9:2781 clearly states "open account" shall include debts incurred for professional services, including but not limited to legal and medical services. Indeed, courts have frequently treated claims for professional services as open accounts. See e.g., Heck v. Lafourche Parish Council, 2002-2044 (La.App. 1 Cir. 11/14/03), 860 So.2d 595, writ denied, XXXX-XXXX (La.3/19/04), 869 So.2d 837 (engineering services); Brod Bagert, A Professional Law Corporation v. D'Hemecourt, 95-1036 (La.App. 5 Cir. 3/26/96), 672 So.2d 998 (legal services); Wells & Parker Architects, Inc. v. Monroe-McKeen Plaza Housing Development Corporation, 556 So.2d 191 (La.App. 2 Cir.1990). (architectural services).
In Heck v. Lafourche Parish Council, supra, the court considered such factors as whether (1) the services provided are performed over time involving various projects; (2) the total fee for the services is left open; and (3) billing occurs on a regular basis by the provider of the professional service by sending regular periodic invoices setting forth the amounts for the services performed, e.g. monthly statements. These factors are not wholly *107 determinative, nor exclusive. Obviously the 1983 amendment allows for an open account action, even for a "one-time" service; however, open accounts ordinarily contemplate a series of transactions between the parties over an indefinite future period. The total cost, unlike a contract, is generally left open or undetermined, although the rate for specific services may be fixed, such as an hourly rate. Finally, the service provider generally requests that the vendee or client keep current on charges through regular billing, and usually sends monthly invoices.
In this instance, there was no written contract or agreement, and the affidavits are silent in this regard. The April 23, 1999 letter was an obvious attempt by Mid-South to set up an "open account" concerning the testing services and consulting services it had rendered to Jones-Odom.
The record indicates the following: (1) Mid-South agreed to take soil samples from the Anderson Island Subdivision, analyze them, and serve as a consultant in the litigation; (2) the total fee for gathering the samples and the analytical testing was left open, apparently dependent on the number of samples and the types of testing; however, the consulting fee was capped at $100,000; (3) there is no evidence of an agreement regarding billing, and no regular billing occurred; (4) invoices were sent only once, and this was 21 months after Mid-South began rendering its services. The invoicing appears to be an attempt to comply with the statutory requirements to file a suit on open account.
Although it is not controlling, Mid-South filed suit under the caption "Petition on Open Account." It is well-settled that the caption of a petition does not control the relief a court may grant. Additionally, R.S. 9:2781 expressly references professional services, including "one-time" transactions. Of course, the purpose of the statute was to allow professionals like doctors and lawyers to collect attorney fees, along with the unpaid professional charges.
The record in this case does not support the conclusion that this was a typical open account arrangement. There was an oral agreement to provide analytical and professional services, but there is no evidence regarding the terms of payment or that Mid-South was lax in not sending monthly statements. However, even though the arrangement was not clearly an open account, it was subject to the three-year liberative prescription. La. C.C. art. 3494. This statute lists open accounts separately from professional services; thus it is reasonable to conclude that a "services rendered" situation or a "professional services" situation is not, ipso facto, an "open account" simply because the "open account" remedy may be an available remedy to collect for professional services. Because Mid-South did not regularly bill or invoice Jones-Odom, nor was there evidence of any agreement for payment on a periodic, regular basis, we cannot unequivocally conclude that the relationship between Mid-South and Jones-Odom was in the nature of an "open account," rather than simply an agreement to provide professional services.

Commencement of Prescription
The determinative issue in this case is when prescription began running on the debt or debts. The court agreed with Jones-Odom's position that prescription began to run when each professional service was rendered. The court stated: "It also seems clear that the services, both analytical and other services, were exigible upon rendition." Since the petition was filed on March 19, 2001, the court concluded that each service rendered on or before March 18, 1998 had prescribed. In other *108 words, if Mid-South took a soil sample on May 9, 1997, payment for taking the sample was exigible on that date and prescription began to run. If Mid-South tested that sample one month later, payment for that testing became exigible on that day and prescription began to run.
La. Civil Code Article 3495 states that "prescription commences to run from the day payment is exigible. It accrues as to past due payments even if there is a continuation of labor, supplies, or other services." Thus the question is whether payment for the analytical and professional services was exigible when each service was rendered.
In Hargrove, Guyton, Van Hook and Ramey v. Blanchard, 216 So.2d 127 (La.App. 2 Cir.1969), the court held that the three-year prescriptive period for payment of legal fees did not begin to run until the termination of legal services. See also, Lyons v. Hall, 90 So.2d 519 (La.App. 2 Cir.1956); Mouton, Champagne & Colomb v. Bourgeois, 208 So.2d 546 (La.App. 3 Cir.1968).
In Evans-Graves Engineers, Inc. v. Cunard, XXXX-XXXX (La.App. 1 Cir. 12/15/95), 665 So.2d 794, writ denied, XXXX-XXXX (La.3/15/96), 669 So.2d 419, the court held that a real estate developer's debt for an engineering firm's services became exigible for purposes of prescription when the development project was abandoned. The court noted that the engineering firm never performed work on a contingency basis, and customarily rendered a bill at a milestone in the project, such as beginning of construction, financing approval, or when the project is abandoned.
In Buras v. Schultz, XXXX-XXXX (La.App. 4 Cir. 2/9/00), 752 So.2d 981, writ denied, XXXX-XXXX (La.4/28/00), 760 So.2d 1178, the court held that the three-year prescriptive period within which a former court reporter could bring his action to recover money allegedly owed for transcripts he prepared on behalf of indigent defendants did not begin to run until funds were available to the Judicial Administrator for payment of outstanding invoices.
In the instant case, the record is silent as to any agreement or expectations of payment for Mid-South's services. Mid-South billed Jones-Odom when the field work and analysis was completed and the litigation had stalled. The last services rendered by Mid-South, however, occurred after March 18, 1998, less than three years prior to filing suit. At that time, it appeared to Mid-South that there was no more activity in the case and the field work in the case was more or less complete. This situation is analogous to the Evans case where payment for the engineering services was exigible upon reaching either a milestone in, or abandonment of, the project. Since no more work was performed, the case is also somewhat analogous to Blanchard, supra. In any event, prescription could not begin to run until the plaintiff could expect or demand payment. Buras v. Schultz, supra.
Mid-South was hired to do a job that would take some time to complete. As the cases reflect, there are many circumstances in the business world where a professional services provider cannot expect payment until certain stages of completion of the job are reached or when the job is finished. In the absence of any evidence of an agreement by the parties as to the terms of payment for the service Mid-South would provide, a genuine issue of material facts exists as to when prescription began to accrue.
Accordingly, the partial summary judgment granted to Jones-Odom is reversed, and the case remanded for further proceedings.

*109 ANSWER TO THE APPEAL
Jones-Odom answered the appeal alleging that the trial court erred in not granting its motion for partial summary judgment dismissing any claim for professional services in excess of $6,645.67, the difference between the amount of the prescribed debt and the alleged $100,000 cap on professional services stated in the April 23, 1999 letter from Lott to Marshall Jones. In its petition, Mid-South sought the actual services rendered amount of $110, 246.53 along with the $28,403.50.
From this record, we cannot conclude that Jones-Odom is entitled to the $100,000 cap for professional services, inasmuch as it apparently refused to pay for any of the services rendered. We affirm the trial court judgment.
Additionally, Jones-Odom appeals the court's ruling denying their motion for summary judgment dismissing Mid-South's claim for attorney fees. The open account statute states that to be entitled to attorney fees, the plaintiff must show that it sent "written demand correctly setting forth the amount owed." Jones-Odom contends that the amount demanded was not correct. First, it claims it received three demands: the April 23, 1999 letter; a letter from Rick Fayard, plaintiff's original counsel dated January 22, 2001; and the petition. Both the petition and the letter from Fayard state the amount as $138,650.03, and the demand letter states $110,246.53 along with $28,403.50 for testing. But Jones-Odom argues that this is incorrect because the letter also references the agreement to cap the professional services at $100,000. Additionally, Jones-Odom contests three of the charges for professional services from a Dr. JDS. Specifically, Jones-Odom contends that each were billings for 8 hours, all dated the same day. Lott responded to this in his affidavit stating that the date referred to the day that he received the bill from Dr. JDS, not the date the testing was performed.
We conclude that these are disputed factual determinations best resolved at trial. We note, however, that the April 23, 1999 letter is not a demand letter as claimed by Jones-Odom. It is a cover letter to a bill and a proposal to Jones-Odom to pay the bill on time. The trial court is in the best position to determine whether the correct amount was stated in a demand letter as required by La. R.S. 9:2781, and whether the invoices for services rendered contain errors.
For these reasons, we affirm the trial court's denial of the partial summary judgment motion regarding these claims.

CONCLUSION
In conclusion, we reverse the partial summary judgment holding that Mid-South's claims for payment for services performed prior to March 19, 1998 had prescribed, and we affirm the judgment in all other respects. We remand for further proceedings in accordance with this opinion. Jones-Odom is cast for costs of this appeal.
REVERSED IN PART, AFFIRMED IN PART, REMANDED.
CARAWAY, J., concurs with written reasons.
CARAWAY, J., concurring.
I respectfully concur.
I would clarify that the majority's emphasis on the analogous implications of Hargrove, Guyton, Van Hook and Ramey v. Blanchard, 216 So.2d 127 (La.App. 2d Cir.1969), and the related jurisprudence, does not establish a rule of law for the ultimate adjudication of this case on remand, but only serves to illustrate the fact-sensitive *110 nature of this dispute and the material fact issues that remain.
The Blanchard ruling can be criticized for its failure to cite the Civil Code's legal measure for adjudication of the issue which suggests a different result as seen in the language of former Civil Code (1870) Article 3535. That article, which is the source article of the present Article 3495, stated that "prescription takes place, although there may have been a regular continuance of ... service" by the service provider. Certainly, the attorneys in Blanchard, who were to be paid by the hour regardless of the outcome of the litigation, arguably provided "a regular continuance" of distinct services throughout the extended litigation period of Mr. Blanchard's domestic action. What defense lawyers and their clients in domestic cases expected regarding the time for payment of fees in the 1960's was no doubt well understood by the judges when that case was adjudicated. Nevertheless, a closely similar attorney fee dispute today involving a defense lawyer and his insurance company/client might result in the application of prescription to bar the collection of fees for services rendered six or more years before the filing of the collection suit.
The reasonable expectations of the client and the service provider regarding the time for payment of services is not usually appropriate for adjudication by summary judgment, but may be tried either summarily with the peremptory exception or with the merits of this case.
NOTES
[1] 73 Fed.Appx. 78 (5th Cir.(La.) June 19, 2003) (not selected for publication in the Federal Reporter, NO. 02-30123). The suit was dismissed via summary judgment.
[2] Louisiana Civil Code Article 3494 states:

The following actions are subject to a liberative prescription of three years:
(1) An action for the recovery of compensation for services rendered, including payment of salaries, wages, commissions, tuition fees, professional fees, fees and emoluments of public officials, freight, passage, money, lodging, and board;
* * *
(4) An action on an open account; [.]
[3] The term "open Account" is not expressly defined by statute; however, La. R.S. 9:2781(D) states in pertinent part:

"[O]pen account" includes any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future transactions. "Open Account" shall include debts incurred for professional services, including, but not limited to, legal and medical services.
[4] TPH means "Total Petroleum Hydrocarbons."